This morning, Caterpillar, Inc. v. Workers' Compensation Commission, 3100660. Counsel, please. Counsel? Good morning. Please, the Court, my name is Mark Peters, and I represent the appellant, Caterpillar, in this case. If Mr. Walker and I am sure are in agreement that Mr. Moncel was a valued member of the Caterpillar team, a talented and skilled manager, and this case involves a terrible tragedy, that is not the issues that we're addressing today, however. There will be four main issues or arguments that I'd like to discuss today. The first is that the Peoria County Circuit Court orders of August 3 and August 23, 2010 are final and appealable orders for purposes of Supreme Court Rules 301 and 303. Secondly, I'll discuss the issues relating to manifest weight, and it's the appellant's contention that all of the issues in this case should be reviewed from a manifest weight standard. Third, the Commission's finding that Section 11 of the Workers' Compensation Act applied in this case, and therefore the motor vehicle accident did not arise out of and in the course of the decedent's employment is not against the manifest weight of the evidence. And finally, the Commission's finding that motor vehicle accident that resulted in the decedent's death did not arise out of the decedent's employment and was not exposed to an increased risk is not against the manifest weight of the evidence. With respect to the issue of jurisdiction, do both of you agree it's the same position or not? Yes. Speaking for myself, that's my contention. Do you still want me to address jurisdiction? Okay. Brief summary and statement of facts. Michael Moncel, the decedent, was a manager at Caterpillar that worked at the company since 1973 up and through the date of his death. By every account, he was an excellent employee, a talented manager, and a skilled engineer. David Eddy was a retired retiree at Caterpillar that worked in the decedent's chain of command. Mr. Eddy reported to Randy Marquis, and Randy Marquis reported to the decedent. On November 24, 2004, Mr. Eddy was retiring. On that date, the decedent discussed with Randy Marquis the possibility of taking Mr. Eddy to lunch, which they agreed upon. Also, just to expedite it a little bit, is there any evidence to establish that the decedent, at the time of the accident, was under the direction or order of the employer to go to this luncheon? No, there is not. All the testimony, all the direct testimony, and several individuals were asked this, including James Sibley, the decedent's supervisor, Richard Havren, and Randy Marquis were all asked in verbatim language that's taken out of the Section 11 statute, and all of them denied that they were under any understanding or were ever ordered or assigned or ever suggested that it was not voluntary. So was the decedent, then, you're saying, was not performing any work-related activity or function at the time of the accident? Is that your position? That's our position. During the lunch hour on that date, the decedent was traveling to the woodcutter by himself. The other three individuals were traveling in a separate car, and a car struck him. A car went through a red light, struck him, and killed Mr. Monselle. The attendees of the luncheon, of course, did not know that he'd been killed, and the luncheon went through. They eventually returned to the office, and at some point thereafter found out that Mr. Monselle was killed in a car accident. Randy Marquis, who reported to Mr. Monselle, submitted a business expense tab to have Caterpillar pay for the luncheon. It was submitted as a business expense and described the luncheon as, quote-unquote, entertainment. Mr. Eddy, again, the person that they were celebrating the retirement, understood that the purpose of the luncheon was to thank him for a job well done. As I previously discussed, there was no testimony that anybody was ordered or assigned. Was there any evidence of any company policy that employees were required to attend these going-away parties? Is there any evidence of that? I don't believe there's any evidence presented either way on that issue. As this Court, I think, knows, the arbitrator ruled in the respondent's favor. Two separate independent issues, section 11, applied. And secondly, the motor vehicle accident did not arise out of decedent's employment. The Commission adopted the arbitrator's decision in its entirety. The Circuit Court reversed, issued two orders. The first order, August 3, 2010, reversed but did not enter an award. And then on August 24, 2010, entered an award. Unless any of the other justices want to hear jurisdictional arguments, I'll move forward to standard review. It's our contention that the standard review is manifest weight on all issues. With regard to standard review as it relates solely to the issue of accident or the arising out of issue, I cited in my brief the Atlantic and Pacific Tea Company that essentially says that this issue, that is the standard review for accidents. I would point out that although counsel cited the Franklin case, the Franklin case involves a totally separate issue, the aggressor defense issue, which I believe is argument, Mr. Walker can speak to this, is that this should be reviewed from DeNovo because the case law is so clear on motor vehicle accidents that it's a DeNovo issue. I would point out in my review of the many cases that were cited in Apley's brief, I did not see one case where they suggested that cases involving motor vehicle accidents where the issue is accident or arising out of that the standard review was DeNovo review. With regard to Section 11, and I'm talking about the standard review as it relates to Section 11, I believe that there's two general issues that are the focus. One was involuntary, and when I say voluntary, I subsume assigned, even though there's separate language, assigned and ordered within that issue. And secondly, whether this was, quote, a recreational program, close quote. I think there's two cases that are right on point that I've cited in my brief. The Pickett case addressed specifically the voluntariness issue, and the Pickett case reviewed that case from a manifest weight standard. With regard to the recreational program issue, how should the court address that from a standard review standpoint? The Kerry case indicates that it should be reviewed from a manifest weight standard. With regard to the arising out of issue, I think the, I already discussed the Atlantic T case. The appellant cites the Cassin's case, excuse me, cites the Cassin's case. With regard to, I apologize, the voluntary and the issues relating to Section 11, which I believe are directly contradicted by Pickett and Kerry. Is there a contention that talking substantially about Section 11, first I want to address the issue of voluntariness or whether the decedent was ordered or assigned to attend this. First of all, there is literally no evidence at all that he was ordered or assigned to this. We had three different witnesses who testified exactly the opposite. The argument that the appellee makes in this case suggests that we should address sort of a totality of the circumstances and look at the decedent's, job opportunity, job description. Perhaps that would be an appropriate argument for the pre-Section 11 amendment, which was in 1980. That type of rationale has been discarded in numerous cases, including the Fisher case. There was a different standard that applied. Now I suggest it's a very strict interpretation. Was the decedent ordered or assigned to attend this event is the sole issue, and once we start going beyond that, we're engaging in a pre-amendment type analysis that has been discarded by the courts. On the issue of whether this is a recreational program, there's not a lot of guidance on this other than as far as how do we interpret the words recreational program. Both parties have submitted case law to suggest in these types of circumstances where there's no definition, we can look to the Webster's Dictionary. Just for the court's information, this is a book that I pulled off my shelf. I did not select and pick, and I use the book consistently for all definitions that I cited in my brief. Recreation is cited by Webster's II College Dictionary as follows, quote, refreshment of one's mind or body after work through an amusing or stimulating activity, synonyms, recreation, diversion, entertainment. I also, refreshment is mentioned in the recreation definition so that I went on to cite the definition of refreshment from that same dictionary, quote, an act of refreshing or state of being refreshed, something as food or drink that refreshes, assortment of light foods, a light snack or meal. So inherent within the definition of the word recreation according to Webster's is refreshment. This was a luncheon that Mr. Monselle planned on going to where they were going to eat. I suggest that falls squarely within the definition of refreshment, which is absolutely inherent in the definition of the word recreation according to Webster's II New College Dictionary. In addition, the word party, which is specifically mentioned in this statute as this court is familiar with, and I say the statute, Section 11, accidental injuries incurring while participating in voluntary recreational programs, including but not limited to athletic events, parties and picnics, do not arise out of and of course the employment and so on. So party is specifically listed and the party is defined as, quote, a social gathering especially for pleasure or amusement, a birthday party, a group of persons gathered to participate in an activity. Also cited as a synonym of recreation is the word entertainment. If we quote, that's the very language that Mr. Marquis used when he described the luncheon in this case, quote, unquote, entertainment, which is a synonym of the word recreation. Now I'd like to address the general issue of did the motor vehicle accident arise out of the decedent's employment. I believe there's two hoops or two issues that I would ask the court to look at. First, whether this was an off-premises luncheon and go through that type of analysis. And secondly, whether a motor vehicle accident in and of itself creates an increased risk once it's found that an employee is in the course of their employment. First, addressing the off-premises luncheon issue, I cited a couple cases, Lynch, Schwartz and Klug. Lynch states that the issue when we're looking at this is the guiding principle in determining whether an employee's injury is compensable for off-premises activities such as luncheons and breaks is whether the employee can be deemed to have waived authority over the employee during the interval. And so, for example, in Schwartz, Schwartz is like this case in that there's no issue that the employee was in the course of employment. Schwartz was the case where the retail manager went with his fiance to a restaurant, not in his building, ate some apparently bad food that was poison, and then shortly thereafter died. And in the Schwartz case, the court suggested there must be some causal relationship between the employment and the injury, and the causative nature must be peculiar to the work and not common to the neighborhood. Klug, it's a similar case of a teacher that was on her lunch break, injures herself while closing a car door, and the court again said this is not a compensable case. I think the key issue that I would suggest that the court has to look at is did the employer, did Caterpillar retain authority over Mr. Moncel during this lunch hour? And we're talking about an employee that has, I might be off, roughly 53 people reporting in his chain of command. And we had Mr. Sibley testify specifically on the relevant language here. Did Mr. Sibley, when he was asked, did you have authority or control over Mr. Moncel on that day for lunch? And his answer was unequivocally no. Counsel, what about the exclusionary part of section 11 that talks about the exclusion won't apply if the event where the employer was injured was part of a program? Counsel, your opposing counsel seems to be arguing that this is the equivalent or tantamount to some kind of a program. What's your response to that? My suggestion is it is a program, and I believe if I understand your question, he's suggesting it's not a program. And I would call your attention to the appellee's brief. And he uses a definition of the word program from his Webster's Dictionary and focuses on the following language. Takes place at a community center, camp, or resort. And the argument as I gather it, Mr. Walker can speak for himself, is this did not take place at a community center, camp, or resort, and therefore this cannot be a program. That's a flawed argument I would suggest based on the current state of the law in Illinois and that we have numerous cases where the courts have found that section 12 applies and they didn't occur at any of those types of places. Your time is up, counsel. Counsel, please. Thank you. May it please the court, my name is James Walker. I represent Patricia Monsell, the widow of Mike Monsell. I'd like to talk a little bit about how this event came together. Mike Monsell, who, as counsel said, was a valued employee of CAD, they were paying him $140,000 in cash plus all kinds of bonuses and incentives, had 59 employees under him. He recruited Dave Eddy, who had been retired for years, out of retirement to come back and work on this special project, even though he reported directly to Mike's lieutenant, Marquis. Marquis came to Mike Monsell, as his reports often did in the morning, that morning, and said, this is Dave Eddy's last day, you might want to go by and say something to him. But Mike Monsell said, we should go to lunch. The first and only mention of the lunch was from the dead man. He didn't come in that morning and say, I am just dying to get some ribs. My wife's going to be feeding me turkey for the next four days. This was the day before Thanksgiving. Come with me, let's go to the woodcutter and eat ribs. No, his origin for this was in response to the other man saying, Dave Eddy, the guy you got out of retirement, this is his last day. Interestingly, when we tried the case, Dave Eddy is back working for CAD. So this concept that my guy is just some kind of social butterfly or something, is absolutely unfounded. He is a recruiter. I've cited in the briefs all these comments about what a great recruiter he has been. That's part of what they paid him for, that's part of what they promoted him. And he knows that when you give people to do that which they didn't think they were going to, you not only pay them cash, but you give them strokes. And that was part of what he was doing, was thanking Dave Eddy for coming in and doing this good job. What is the standard of review here? I think the only issue is section 11. The arbitrator commission found in course of, the commission is just flat wrong on arising out of. I've cited 15 cases saying, if you're traveling in the course of your work, and you get killed in an accident, it doesn't make any difference whose fault it is, that arises out of. That may be true if you assume that he's traveling in the course of his work. But the question becomes, what work related activity or function was he performing at the time of the accident? I agree. If I get him in the course of, then arising out of is simple. So I think the only issue is section 11. You asked Caterpillar a question. So you're saying that he was going to this luncheon in no part of his work, and Cat answers yes. But actually Cat wrote the opinion for the arbitrator, which the arbitrator adopted, and the commission then adopted, saying he was in the course of his employment. Was this accident arising out of? It arose out of because it was an auto collision while he was driving for company business. At least as I understand these two phrases, the course of question was, was this a work related activity? And the commission found, and Cat has never contested that. As a matter of fact, Cat fed that language to the commission in its proposed decision. So what was the commission's decision? The commission's finding was he was in the course of his employment, but section 11 takes him back out again. And in three different places she says that. We've cited those. So as I look at it, section 11 is the only issue. And to answer your question, Justice McCullough, that's a question of law because it's a matter of statutory interpretation. What does it mean? What does the phrase voluntary recreational programs mean? Because we suggest it did not fall into one of the three examples. This is not a party. There's no alcohol. There's no decorations. There's no balloons. There's no funny jokes. There's no cakes. There's no nothing. It's not a picnic. Even they don't try to say it's a picnic. And it's not an athletic event. So then we go to, all right, how do we solve these statutory construction type problems? Before I go into that, one other thing I wanted to mention was there was some discussion about it was put down as entertainment. Every meal expense is entertainment. Look at our Exhibit 11, which is a history of Mike Moncel's expenses for the prior year. Every time these guys buy a meal, it doesn't make a difference if they're eating by themselves or with 20 people. That's just what the computer says. It says business travel for mileage. It says entertainment for meals. That may be true, but was this not in essence a social gathering? It wasn't a work-related seminar, was it? It certainly wasn't a work-related seminar, but it was very much a part of work. I mean, it arose out of work, not out of a desire, let's go eat at the woodcutter. I want to hit on the waitress or enjoy their ribs or something like that. It rose out of the fact that they wanted to thank Dave Eddy for coming back and doing a good job. And your argument is that his job as a recruiter is to create a climate where a person wants to be there, wants to be involved in the team, and that would likely agree to be recruited for another job. I wish I had said it that well myself. This is our exhibit. I've forgotten which one it is. But anyhow, it's the 2007 AQI Award Ceremony. That's where they brought Mike's widow in, because Mike was a part of a team. And you remember, he died in November of 2004. He was a part of a team that got one of the top five awards for 2007. And so they had the president of CAT stand there holding the trophy with my client, Mike's widow. Now, that awards program starts with 30 minutes of refreshments. Then the CAT president says a few remarks. And they give out their awards. Then they go to the CAT cafeteria for a buffet lunch. CAT understands the value of food in relationship with stroking. We all do, too. And nobody told the president of CAT, now you've got to show up at this program. Now, it was implicit in his duties that he was going to be there. That's why they pay him the bucks that they do. Same is true with Mike Monsanto. I mean, he's running 59 engineers. All these other cases involving firemen or people going to, machinists going to the company and so forth, there are people whose contributions to their employer have to do with their own mind and their own hands. Well, you know, he's traveling. But I don't think he's precisely what we consider a traveling employee who's out away from his home base and therefore he's sort of on call 24 hours a day. I think the only thing the traveling employee fits here is back to our comment about arising out of. Because he was traveling incidental to his work, the injuries arising from the highway collision arose out of his work. Now, this was sort of an impromptu gathering. I mean, this wasn't something that had been planned in advance, correct? Totally. Just three hours before the event. So are we saying then, your logic would be that whenever there's an impromptu retirement party at CAT, if an accident occurs where somebody's driving to that, it's compensable? I'd rather not use the words retirement party, but... Wasn't this a retirement party? Well, the guy who was honored said they were thanking me for a job well done. I mean, he was already retired many years before. Well, let's take the word retirement out of that. That's easier. Anytime there's an impromptu luncheon for somebody, an executive at CAT, whether it's retirement or not, and somebody gets into an accident on the way to the restaurant, it would be your position, that's compensable. My position on these facts is it should be compensable every single time, that's right. Because that was the sole purpose of this lunch, was to thank Dave Eddy for a job well done, and to increase the chances that he might come back again, should they need him. Which, if you remember, he testified at arbitration, and I said, did this contribute to the likelihood of your coming back? He said, well, I'm back working for him again. So, I mean, what is it that Bill or Mike or somebody, that if that they have that they can recruit? I'm not sure I know all those things, but I think this is an example of it, that you just don't dangle money. There's other things involved in all the whole HR system, and this was part of it. Your view is that Eddy's not an employee, but he's an independent contractor, really? He was at the time of arbitration, but at the time of this, he was a CAT employee. He had retired for many years, then they brought him back as a true CAT employee for 18 months. This was the last day of that CAT employment. Then at the time of arbitration, he was doing CAT's work, but he was for a subcontractor. And, of course, my guy, Mike Moncel, I think he had about, don't hold me to the facts, but about 25 or 30 of his engineers, they got a CAT W-2, and about another 20 of the engineers that he was responsible for got some sort of independent contractor check. So, I mean, CAT does some of its work in this manner. This was not a voluntary recreational program, but if it was, if it was, who was the program director on behalf of CAT? There's only one answer, Mike Moncel. He's the only guy who brought it up. He's the father of it. He originated it. And he said, we should go to lunch. So CAT's right that it's a voluntary. No, he said, we should go to lunch. The testimony of the survivor was his lieutenant said, Mike responded, we should go to lunch. And that we included Mike. And the workaholics, when they come to get him to go to lunch, he's still completing another interview. You know, first time employment type interview. And he said, I'm not quite done. Go ahead. I'll join you there. Now, this is a guy that's, you know, the social butterfly and can't wait to get there and throw one down. He simply was simply Moncel's boss. What did he say? Well, he said, I was invited, but I decided to go home that afternoon. Then they asked him, well, did you assign Mike Moncel to do this? No. Did you order him to do this? No. Of course he didn't. That's not how you do, that's not how executives work. They do a lot of things on their own initiative. Then when I asked him, have you ever assigned Mike Moncel to make a trip? No. When Mike Moncel took a trip, did you ever discipline him for it? No. I mean, Sibley's reports of this guy before he died are glowing. He gives great amount of his nights and weekends for the company. I mean, he gives all of these glowing reports of this guy. This is the reason Cat's making the money it is, people like Mike Moncel. You don't look at their decisions and their time and so forth the same way you would a machinist. You wouldn't expect a machinist to be able to call a business luncheon on the last day of a fellow machinist. Once again, is this question one of a manifest way? Not section 11, your honor. I submit it's statutory interpretation. The commission's interpretation that this was like a party in that people joined together and shared food. They're expanding it beyond the statute and the statutory construction. Section 11 is contrary to the common law. And the rules of statutory construction are, if a statute is going to carve something out of the common law, it must do so expressly and you must construe the exception narrowly. And the commission didn't construe it narrowly. It reached way out there to make this thing a party within the meeting. It's not a program. You don't put a program together three hours before the program on an exchange of a couple words. It's not a program and it's not a party. No booze, no cake, no balloons, no nothing. Look who was invited. Not a single person below Dave Eddy in the pecking order. The people that were invited were the people above him. So in conclusion, how would you define this event? If it's not a social gathering slash party, what is it? A business lunch. It's a business lunch. You have to use a label. It's a business lunch. It's the superiors of Dave Eddy. You know, the retirement party, you want to jump to the conclusion, oh, that's where, you know, social butterfly Susie brings some party things and they have games and all this stuff and they give the retired person a cane and a set of golf clubs and all that sort of thing. Nothing like that here. This is these CAT executives putting their arm around Dave Eddy saying, Dave, thanks for helping us on this project. And if Eddy's expertise was unique, I think it had something to do with... Thank you, Tom, for your time. Thank you. Rebuttal, please. Thank you, Your Honors. Let's address a few quick issues. Business lunch, just because Mr. Walker says it's a business lunch, does not make it a business lunch. Unfortunately, we have a record that we have to look at. There are two witnesses that testified and were asked about, you've had lunches in the past where you talk about, these are engineers, and talk shop and talk about engines and talk about tractors and talk about design, and were specifically asked, was this one of those type of lunches? And the answer was no. This was a lunch to thank Mr. Eddy. And if this is not a social gathering that falls under Section 11, if this is a business lunch, every lunch at Caterpillar is a business lunch. There is no such thing as anything that's not a business lunch. I think Mr. Walker is going and looking at what the position was in the company and suggesting that this is part of an ongoing effort to make sure that people want to be recruited. Right. And that's clearly the argument. And I guess two things, that sort of totality of the circumstances type argument was rejected by the courts. And secondly, every manager at Caterpillar has some expectation that they're going to keep their employees, and there's even records in the PDPs of employment scores, or they call them employment scores, where they get graded on how their employees view them. Every manager has some expectation of that. But that doesn't mean that every time a manager suggests that somebody that reports to them should go to lunch, that that becomes a business lunch. The example of talking about, there's no shop talked about this, there is no business purpose, other than he wanted to say thank you to an employee. Caterpillar did pay for the lunch. That's correct. And as you know, under Section 11, that's irrelevant. But they did pay for the lunch, and it was called, quote, unquote, entertainment. Mr. Walker's making assumptions that every expense that's ever been submitted at Caterpillar is entertainment. I don't know that to be true at all. Many of the cases cited, and I cited, there was about 16 cases that were mostly string sites cited by Mr. Walker that were traveling employee cases. This issue of arising out of and whether a motor vehicle accident arises out of employment once you show that they're in the course of. Well, if these are traveling employee cases, this Court is very familiar with the standard there, which is reasonable and foreseeable. There has never been any assertion by Mr. Walker or anybody else that he was a traveling employee. Those cases are 100% irrelevant. Mr. Walker's also suggests that once you get through Section 11, and Section 11 is clearly, this case clearly doesn't fall in Section 11, that the arising out of issue, that's a done deal. Well, the Court, the Illinois Supreme Court and Quarant certainly found different. They found that you need to look at both. They went through an analysis where they said, even if you find that this is the teacher that was in an auto accident going to school, and they found that she was not in the course of her employment, which I know is distinguishable from this case. But they said, even if you find that, there's still got to be more. And the cases that he cite talks about where the Courts go into detail about some of the increased risk that the employees were exposed to. For example, in the Benjamin Sanborn case, which is a case where the employee was directed to go with her employer and they got in an accident because slipping on ice. Simply being on a highway in the course of employment is not enough, and the Library and Courts establishes three additional factors that have to be looked at in determining whether the employee was in the course of. In conclusion, and one final issue, on the manifest weight issue, Mr. Walker says this is not manifest weight under Section 11. He doesn't cite one case that supports that. There's never been a case ever that says this is a de novo issue, and Pickett and Carey are exactly on point and address the issue of whether it should be addressed from a manifest weight standard. So I suggest that the Court would have to make several findings before we reverse the Commission in its entirety and suggest that this was a completely non-compensable case. As this Court is well familiar with, the Court would have to find that the opposite result is clearly apparent under Durand, or that there was some evidence, or the issue, another way to look at it, was there some evidence in the record to support the Commission's decision. Counsel, your time is up. Thank you. The Court will take the matter under advisory for disposition.